**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

RIB ROOF METAL SYSTEMS, INC., and
COMPONENTS PLUS, INC.,

                      Plaintiffs.

-vs-

NATIONAL STORAGE CENTERS OF
REDFORD, INC.,

                      Defendant.
_____/

CASE NO. 07-CV-13731

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

**OPINION AND ORDER**
**(1) DENYING THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT ON**
**PLAINTIFFS' DECLARATORY JUDGMENT ACTION;**
**(2) GRANTING SUMMARY JUDGMENT TO PLAINTIFFS ON DEFENDANT'S**
**STATUTORY CONVERSION COUNTERCLAIM; AND**
**(3) DENYING SUMMARY JUDGMENT TO PLAINTIFFS ON DEFENDANT'S**
**COMMON LAW CONVERSION AND UNJUST ENRICHMENT COUNTERCLAIMS**

      Before the Court are the following motions: (1) Plaintiffs' (Rib Roof Metal Systems, Inc.

and Components Plus, Inc.) May 30, 2008 Motion for Summary Judgment on Defendant's

Counterclaim and for Summary Judgment on its Declaratory Judgment Action (Doc. No. 21);

and (2) Defendant National Storage Centers of Redford Inc.'s ("Defendant") June 16, 2008

Motion for Summary Judgment on Counts III and V of its Counterclaims and for Summary

Judgment on Plaintiffs' Complaint for Declaratory Judgment (Doc. No. 23). Both parties filed

Responses. The Court held a motion hearing on August 20, 2008.

      Having considered the entire record, and for the reasons that follow, the Court DENIES

the parties' cross motions for summary judgment on Plaintiffs' declaratory judgment action;

GRANTS IN PART and DENIES IN PART Plaintiffs' motion for summary judgment on

Defendant's counterclaims, and DENIES Defendant's motion for summary judgment on Counts III and V of its counterclaim.

## I.  BACKGROUND

This diversity case arises from Plaintiffs' seeking of a declaratory judgment stating that Plaintiffs are legally entitled to keep the $137,975.00 paid to them by check by Defendant. Defendant alleges that Gary Gerrits, a non-party to the instant litigation, fraudulently induced it to write a check in that amount to Plaintiffs – that it had no monetary obligation to Plaintiffs.

Plaintiff Rib Roof Metal Systems, Inc. ("Rib Roof") is a Tennessee corporation, with its principal place of business in Tennessee. (Compl. ¶ 1). Plaintiff Components Plus, Inc. ("CPI") is a corporation registered in Texas, with its principal place of business in Texas. (*Id*. at ¶ 2). Defendant is a Michigan limited partnership, with its principal place of business in Michigan. (*Id*. at ¶ 3). Carl Mitchell is the president of Rib Roof. (Def. Br. Ex. Q, Mitchell Dep. 6-7). Verne Moser is Rib Roof's chief financial officer. (Def. Br. Ex. A, Moser Dep. 5). Rib Roof and CPI are sister corporations and share the same business accounts. (*Id*. at 7). Rib Roof is in the business of designing, manufacturing, and installing metal roofing and building systems. (Pls. Br. Exs. A & B Moser Aff. ¶ 2 & Mitchell Aff. ¶ 2).

This case involves contracting / building of self-storage facilities. During late 2004 or early 2005, Randy Ferrell, Plaintiffs' employee, became acquainted with Gerrits through the latter's work at a company called OB Construction. (Mitchell Dep. 10-12; Def. Br. Ex. R, Ferrell Aff. ¶ 3). Ferrell stated that Gerrits mentioned that he had three construction projects "in the works" or "in the pipeline," with one of them being a self-storage construction project in Redford, Michigan. (Ferrell Aff. ¶ 4; Moser Dep. 46). Ferrell approached Mitchell and told him that Gerrits wanted to start his own general contracting business and that Gerrits needed funding.

(Mitchell Dep. 10; Ferrell Aff. ¶ 6; Moser Dep. 14). Gerrits proposed that in return for three installments of $25,000 each to fund his business, Gerrits would repay Rib Roof from his profits from his general contractor jobs, and promise to use Rib Roof's material and services for the jobs. (Mitchell Dep. 13-14). Mitchell testified that he spoke with Gerrits on the phone about the proposal for about twenty minutes, but never met him in person. (*Id*. at 9, 14). Moser testified that Plaintiffs were particularly interested in the proposal since they wanted to expand their business in Michigan. (Moser Dep. 15). After discussing Gerrits' idea with Ferrell and Moser, Mitchell's Rib Roof ultimately decided to lend Gerrits the funds. (Mitchell Dep. 15).

On January 7, 2005, Rib Roof and Gerrits executed a promissory note, drafted by Moser, where Rib Roof would make three payments of $25,000 each to Gerrits' business, Commerce Companies LLC ("CCL"). (Def. Br. Ex. B, Agreement for Lending of Working Capital; Mitchell Dep. 17; Moser Dep. 21). The relevant terms of the note included:

> This Agreement is made between Rib Roof, Inc. (hereinafter RRI) and (a California Corporation) and Commerce Companies LLC (hereinafter CCL) and (a Michigan Limited Liability Company) for the purpose of advancing $75,000 in working capital fund: by RRI to CCL.
>
> The terms and conditions of this Agreement are as follows:
>
> 1.   RRI will advance $25,000 to CCL in the months of January, February and March of 2005 for a total of $75,000. The initial payment will be made upon the execution of this Agreement by both parties. Thereafter, payments will be made on the 15th of February and March, 2005.
>
> 2.   CCL will use the funds as working capital for the purpose of obtaining contracts for the installation of Rib Roof metal building products over the next 6 months. It is understood that CCL will purchase such materials as required under the contracts at agreed upon prices between Rib Roof Metal Systems, Inc. and CCL.
>
> 3.   CCL will repay RRI for all funds advanced from the proceeds of the initial construction contract that it completes and bills to its customer.

4.      Gary Gerrits will execute the promissory note below both as the managing member of CCL and as an individual.

5.      This agreement and note will be deemed to have been executed under the laws of the state of California.
. . . .
Promise to Pay: Gary Gerrits and Commerce Companies, LLC (hereinafter called "borrowers") promise to pay to Rib Roof, Inc. (A California Corporation and hereainafter called "lender") or to order, in lawful money of the United States of America, the principal amount of [$75,000] within 180 days of this note.

Payment: Borrowers will pay the entire principal of this note upon receipt of payment of funds from the initial self-storage construction contract entered into between Commerce Companies, LLC and its customer.

Lender's Rights: Upon borrower's failure to pay all amounts due in accordance with the terms of this note, Lender, at its option, may declare the entire remaining amount owed due and payable upon demand. Lender's attorney's fees and legal expenses whether there is a lawsuit or not will be paid by the borrower. The note has been accepted by the borrower in the State of California and it shall be governed by the laws of the State of California.

(Agreement of Lending Working Capital).

On February 17, 2005, CCL and Rib Roof entered into a subcontractor agreement for a storage facility in Brighton, Michigan. (Def. Br. Ex. C, Subcontractor Agreement). The subcontract specified that CCL would pay Rib Roof $178,300.00 for the required work. (*Id*.). Ferrell stated that he added the first $25,000 advance from the promissory note into that subcontract price. (Ferrell Aff. ¶ 8).

During the Brighton project, Rib Roof sent an invoice for the Brighton project for $29,325.00. (Def. Br. Ex. D, Invoice). Rib Roof accepted a check from Gerrits, dated September 9, 2005, for that amount. (*Id*.). However, by the end of 2005, Gerrits still owed Plaintiffs $87,975.00. (Moser Dep. 42).

On December 2, 2005, Gerrits sent a letter to all of the subcontractors and suppliers on the Brighton project, explaining that he was having trouble getting payment from the owner:

During a meting held with the Owner's (sic) of the Downtown Brighton Self Storage project on Wednesday, November 30, 2005, I was informed that the balance due to a Commerce Companies LLC in the amount of $248,722.56 would not be paid at that time.

I have obtained a promissory note from the owners for the outstanding balance. The note is scheduled to be paid on or before December 1, 2006. The note bears interest at the rate of 8% per annum. The note is secured by an ownership interest in the LLC that owns the property, which is to say that the note is secured by the property. The current estimated value of the completed project is approximately $1.6 million. There is an existing loan with First National Bank of Brighton in the amount of $900,000. Our contract with the Owner is in the amount of $700,922.56. We have been paid approximately $450,000 to date.

Yesterday I took a copy of the Promissory Note and other pertinent information to my own bank and they are in the process of analyzing the information to determine if they will lend us the money, or at least a significant portion of it, so that we can get all of the subcontractors and suppliers paid now rather than waiting any longer for the Owner. My banker indicated that it is possible to utilize the property as collateral to secure the loan, however an appraisal will be required before they can do anything. The amount of the loan request exceeds my personal banker's lending authority limit and the person with sufficient authority is on vacation through Tuesday, December 6th. I will be seeing them again on Wednesday, December 7th. However, I was informed that it will take approximately 6 weeks to get an appraisal done and then some additional period of time to actually get a loan closed for Commerce Companies, LLC. Thus, I am sorry to inform you that I do not believe that any of us will be able to get paid on this job for at least eight weeks. Therefore, I expect to be issuing final payments on this job in February, 2006.

My intention is to borrow the money to get your company paid for the work you provided. I am hopefully that the Owner will pay me back for the money I intend to borrow to accomplish this as I would prefer that to a long term ownership interest in the property, however, only time will tell what will occur. I propose to accrue interest for you on your outstanding balance at a rate of 8% per annum until we can get our loan closed and then include that amount when we make a payment to you. I apologize to you for this entire scenario and hope that you will understand that Commerce Companies is doing everything we can to get your bill paid at the earliest possible time. In the meantime I suggest you take whatever action you deem necessary to protect your interests. If I can be of any assistance in that regard, please do not hesitate to call.

(Def. Br. Ex. E, 12/2/05 Letter).

During the work on the Brighton project, OB Construction, one of Rib Roof's customers, notified Rib Roof that the former had a falling out with Gerrits and that if Rib Roof did any further business with him, OB Construction would pull its business from Rib Roof. (Mitchell Dep. 20; Ferrell Aff. ¶ 11). Moser testified that he attempted many times to obtain payment from Gerrits. (Moser Dep. 25-26). Gerrits indicated to Plaintiff Rib Roof that he was going to possibly seek a bank loan to pay Rib Roof for the money owed. (Mitchell Dep. 20, 32).

After not receiving payment for the Brighton project, Mitchell decided not to do any further direct business with Gerrits. (*Id*. at 19-20, 36; Ferrell Aff. ¶ 12).

During late 2005 and early 2006, Maurice Pagoda, Defendant's managing partner, met with Gerrits to discuss the construction of a self-storage facility in Redford, Michigan. (Def. Br. Ex. S, Pagoda Aff. ¶ 5). On December 15, 2005, Gerrits submitted a general contractor proposal to Pagoda. (Def. Br. Ex. H, General Contractor Agreement). The relevant proposal mentioned Rib Roof as a possible manufacturer for portions of the "pre-engineered structural system" and "pre-engineered roof system." (*Id*.). On January 23, 2006, Gerrits submitted some modifications to the proposal, with a revised amount of $1,624,886.00 for the project. (*Id*.).

During January 2006, David Dodge, president of Paramount Metal Systems, Ferrell, and Gerrits had discussions about the upcoming Redford project. (Def. Br. Ex. G, 1/06 Emails). Mitchell indicated that Rib Roof would not directly work for Gerrits, but would agree to be a supplier to the ultimate subcontractor Paramount. (Mitchell Dep. 45; Ferrell Aff. ¶ 13; Moser Dep. 32-33). Ferrell assisted Paramount with the preparation of its subcontractor bid up through late January 2006. (Ferrell Aff. ¶ 15). Mitchell was aware that Ferrell was working with Paramount in connection with the Redford project. (Mitchell Dep. 39-40). He further indicated that he felt more confident dealing with Paramount than with Gerrits. (Mitchell Dep. 48-49).

On January 23, 2006, Defendant and CCL entered into a general contractor agreement on the Redford self-storage project. (General Contractor Agreement; Pagoda Aff. ¶ 6).

In early February 2006, Pagoda testified that Gerrits presented to him a subcontractor agreement with Rib Roof, for the amount of $445,000.00. (Pagoda Aff. ¶ 8; Def. Br. Ex. I, Subcontractor Agreement). This was not a valid agreement; there was no such agreement. Gerrits made a sworn statement to Pagoda that Rib Roof needed to be paid $137,975.00 in order to deliver materials to the Redford project in a timely manner. (Pagoda Aff. ¶ 9). Pagoda stated that at the time the request did not appear unusual since he knew that Rib Roof was in the relevant business. (*Id*. at ¶ 10). Pagoda then reviewed the subcontractor agreement presented by Gerrits. (*Id*. at ¶ 11). Unbeknownst to Pagoda, Gerrits had fraudulently fabricated the subcontractor agreement; Rib Roof had never agreed to be a subcontractor on the Redford project.

Pagoda then issued a check payable to Rib Roof for $137,975.00. (*Id*. at ¶ 12). Moser received a telephone call from Gerrits indicating that the latter was going to send the check. (Moser Dep. 91-92). Gerrits sent a check for $137,975.00 drawn upon Defendant's account. (Moser Aff. ¶ 5; Def. Br. Ex. J, Check). The memo line on the check read "06-MI-3095." (Check). Gerrits included with the check a letter explaining how Rib Roof should credit the check against his account:

> Hello Lolly:
>
> Vern Moser asked me to forward this check directly to you for you to deposit into the proper accounts. The check should be credited as follows:
>
> | | |
> |---|---|
> | Brighton, MI job balance on contract: | $62,975.00 (full and final payment) |
> | Repayment of 1/11/05 loan | $25,000.00 |
> | Repayment of 2/16/05 loan | $25,000.00 |
> | Repayment of 3/15/05 loan | $25,000.00 |
> | TOTAL | $137,975.00 |

The subcontract written on Brighton had included an additional $25,000 over the agreed amount, which was the amount of the first advance against my Promissory Note to Carl and Chris. I believe that with the payment of this $137,975, I should be fully settled with Rib Roof, Carl and Chris on all work completed to date and on my loan. Future work will be handled through David Dodge and Paramount Building Systems per my discussions with Randy and others over the past several months. If this is not the correct amount, please let me know right away. Thank you.

(Def. Br. Ex. K, 2/10/06 Letter of Transmittal; Moser Aff. ¶ 6).

Ferrell stated that he had a conversation with Lolly Peirson during which he indicated surprise that Gerrits was able to pay that amount. (Ferrell Aff. ¶ 18). No individual from Rib Roof contacted Defendant to inquire into the origin of the check. On February 15, 2006, Rib Roof deposited the check and credited Gerrits' account. (Moser Aff. ¶ 6; Pagoda Aff. ¶ 13; Def. Br. Ex. M, Deposit Slip). Plaintiffs admitted that Rib Roof had not provided any direct materials or services to Defendant. (Mitchell Dep. 55, 65-66; Moser Dep. 74). Plaintiffs did not seek to validate or decipher the code on the memo line of the check – "06-MI-3095" – or call Defendant to ascertain what it meant. Plaintiffs stated at the time of the reception of the checks that they had no reason to believe that Gerrits had defrauded Defendant into producing the check. (Moser Dep. 79-80).

On February 14, 2006, CCL entered into a subcontracting agreement for $456,000.00 with Paramount for the Redford project. (Def. Br. Ex. M, Subcontracting Agreement). Paramount then issued purchase orders to Rib Roof for various materials for the Redford project. (Ferrell Aff. ¶ 19; Moser Dep. 13).[1]

---

[1]     It appears that Rib Roof and Paramount are currently involved in a side-dispute over the payments for the Redford project. (Mitchell Dep. 43-44). However, there does not appear to have been a lawsuit filed in connection with that dispute.

In their Complaint, Plaintiffs seek a declaration from the Court that they are entitled to keep the amounts of $16,143.70 and $18,760.27 of the $137,975.00 in dispute as amounts owed to them by Paramount. (Compl. ¶ 15; Mitchell Dep. 68-69). However, Moser testified that he did

On August 10, 2006, corporate counsel for Defendant notified Rib Roof of Gerrits'
actions and demanded a return of the check. (Def. Br. Ex. P, 8/10/06 Letter). Pagoda states that
as a result of Gerrits' fraud, Defendant lost "hundreds of thousands of dollars" on the Redford
project. (Pagoda Aff. ¶ 22).

On August 25, 2006, Plaintiffs filed a Complaint for a declaratory judgment in the United
States District Court for the Western District of Tennessee. On October 16, 2006, Defendant
filed a motion to dismiss for lack of personal jurisdiction. On August 28, 2007, the Tennessee
district court granted Defendant's motion and transferred venue to the Eastern District of
Michigan. *See Rib Roof Metal Sys., Inc. v. Nat'l Storage Ctrs of Redford*, No. 06-02553 (W.D.
Tenn. Aug. 28, 2007).

On May 1, 2007, Gerrits and his company CCL filed separate voluntary petitions for
bankruptcy under Chapter 7 in the Eastern District of Michigan. According to CCL's summary
of schedules, it had $2,569,756.93 in liabilities.

On August 8, 2007, Defendant filed an adversary bankruptcy action against Gerrits,[2]
claiming that Gerrits' debts were non-dischargeable under 11 U.S.C. § 523(a). In addition to
alleging the fraudulent procurement of the check to Rib Roof, Defendant made a variety of

---

not believe that Plaintiffs had a right to retain the money paid by Defendant for debts owed to
them by Paramount. (Moser Dep. 99). Whether or not those amounts are found to be due to
Plaintiffs, they still maintain that they are entitled to keep the entire $137,975.00.

[2]     On August 8, 2007, Gratiot Place, LLC filed an adversary proceeding against Gerrits for
failure to pay subcontractors on a 2006 self-storage project in Saginaw, Michigan. The
subcontractors in that instance also filed liens on Gratiot's property. On October 16, 2007, the
bankruptcy court entered a default judgment against Gerrits. *See Gratiot Place, LLC v. Gerrits*,
No. 07-48652 (Bankr. E.D. Mich. Oct. 16, 2007).

Finally, the Pagoda Companies filed an adversary bankruptcy case against Gerrits in
connection with a 2006 office space renovation in Farmington Hills, Michigan. On October 16,
2007, the bankruptcy court entered a default judgment against Gerrits. *See The Pagoda Cos. v.
Gerrits*, No. 07-06189 (Bankr. E.D. Mich. Oct. 16, 2007).

additional allegations, including that Gerrits: (1) procured a similar fraudulent check to Janus International Corporation for $148,930.00 to pay his preexisting debts to that company; (2) made false sworn contractor statements on June 29, 2006, and August 28, 2006, misrepresenting cost overruns for the Redford project; (3) failed to pay certain subcontractors on the project, resulting in them filing liens on Defendant's property; and (4) failed to indemnify Defendant or provide a bond. On October 16, 2007, the bankruptcy court entered a default judgment against Gerrits. *See NMS of Redford Ltd. P'ship v. Gerrits*, No. 07-06187 (Bankr. E.D. Mich. Oct. 16, 2007).

During 2007, Defendant contacted the Oakland County Prosecutor's Office, which subsequently filed a criminal complaint against Gerrits. (Pagoda Aff. ¶ 19). The Oakland County Prosecutor charged Gerrits with two crimes: (1) false pretenses ($20,000 or more), Mich. Comp. Laws § 750.2185A; and (2) contractor false statements, Mich. Comp. Laws § 570.1110(10)(d)(i). (Def. Br. Ex. N, Criminal Case). On November 1, 2007, Gerrits pleaded guilty in Oakland County Circuit Court to the charge of contractor false statements. (*Id.*). He stated in his plea offer:

> I signed a false sworn statement. It was false because it stated that I owed a steel subcontractor a deposit of $134,000 on estimated total job cost of $520,000. I owned that subcontractor $134,000 on open account from a [previous] project and not as a deposit on the current project. I submitted the false sworn statement to the project at this office in Farmington Hills.

(*Id.*).

On December 13, 2007, the Oakland County Circuit Court sentenced Plaintiff to incarceration for a minimum of 28 months and a maximum of fifteen years. The court indicated that restitution was "to be determined." Plaintiff is currently serving his sentence.

On February 4, 2008, Gerrits' chapter 7 bankruptcy case was closed upon the full administration of his assets. *See In re Gerrits*, No. 07-48652 (Bankr. E.D. Mich. Feb. 4, 2008).

As of the date of the instant Order, the CCL bankruptcy case is still pending. *See In re Commerce Companies, LLC*, No. 07-48645 (Bankr. E.D. Mich. filed May 1, 2007).

On November 19, 2007, Defendant filed the following Counter-Claims in the instant case:

| | |
|---|---|
| Count I: | Conversion |
| Count II: | Statutory Conversion |
| Count III: | Unjust Enrichment |
| Count IV: | Civil Conspiracy |
| Count V: | Declaratory Judgment |

On May 30, 2008, Plaintiffs filed a motion for summary judgment on Defendant's counter-claims and on their own claims. On June 16, 2008, Defendant filed its own motion for summary judgment on its counterclaim Counts III and V, and for the entirety of Plaintiffs' claims.

## II.     ANALYSIS

### A.     Summary Judgment Standard

The United States Court of Appeals for the Sixth Circuit has summarized the standard for summary judgment:

> Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. "The judge is not to weigh the evidence and determine the truth of the matter, but rather determine whether there is a genuine issue for trial."

*Totes Isotoner Corp. v. Int'l Chemical Workers Union Council/UFCW Local 664C*, 532 F.3d 405, 410-11 (6th Cir. 2008) (internal citations omitted).

### B.     Defendant's Counter-Claims

In support of summary judgment on their declaratory action and against Defendant's counterclaims, Plaintiffs primarily contend that: (1) Gerrits did not as an agent for Plaintiffs; (2)

Plaintiffs were holders in due course of Defendant's check, thus free from Defendant's claims; and (3) Plaintiffs did not have knowledge or notice that the check had been embezzled by Gerrits.

Defendant maintain that: (1) Gerrits acted as an "agent" of Plaintiffs in obtaining the check; (2) there is circumstantial evidence supporting a reasonable inference that Plaintiffs knew that Gerrits had fraudulently obtained the funds; (3) Plaintiffs waived their Uniform Commercial Code ("UCC") defenses by not raising them in their affirmative defenses; (4) Plaintiffs were not holders in due course under UCC; (5) even if Plaintiffs were holders in due course, they are subject to Defendant's fraudulent inducement defense; and (6) the Court should impose a constructive trust on Plaintiffs.[3]

       1.      Agency Relationship

Although Plaintiffs never employed Gerrits nor expressly permitted him to enter into contracts on their behalf, Defendant emphasizes the language in the promissory note's term directing Gerrits to use the $75,000 loan to "obtain[ ] contracts for the installation of Rib Roof metal building products over the next 6 months." Per Defendant, Gerrits was acting within the scope of his agency relationship with Plaintiffs when he fraudulently induced Defendant to cut a check purportedly for a requested advance by Rib Roof – when Gerrits' true motivation was to satisfy his personal debts and funds owed to Rib Roof from the Brighton project. Defendant maintains that even if Gerrits acted outside the scope of his agency in procuring the check, Plaintiffs' subsequent actions in keeping the funds ratified the intentional and/or illegal act.

The Michigan Supreme Court has discussed the nature of agency:

> Under the common law of agency, in determining "[w]hether an agency has been created," we consider "the relations of the parties as they in fact exist under their agreements or acts" and note that in its broadest sense agency "includes every

---

[3]      In its pleadings, Defendant appears to have abandoned its civil conspiracy counterclaim.

relation in which one person acts for or represents another by his authority." We further recognized in *Saums* that "[t]he characteristic of the agent is that he is a business representative. His function is to bring about, modify, affect, accept performance of, or terminate contractual obligations between his principal and third persons." Also fundamental to the existence of an agency relationship is the right to control the conduct of the agent[.]

*St. Clair Intermediate Sch. Dist. v. Intermediate Educ. Ass'n/Michigan Educ. Ass'n*, 458 Mich. 540, 557-58 (1998) (internal citations and footnote omitted). The Michigan Court of Appeals has further explained:

Where there is a disputed question of agency, any testimony, either direct or inferential, tending to establish agency creates a question of fact for the jury to determine.

An agency relationship may arise when there is a manifestation by the principal that the agent may act on his account. The test of whether an agency has been created is whether the principal has a right to control the actions of the agent.
. . . .
The authority of an agent to bind the principal may be either actual or apparent. Actual authority may be express or implied. Implied authority is the authority which an agent believes he possesses. After the agency relationship and the extent of the agent's authority have been shown, the principal has the burden of proving that the agent's authority was limited.

*Meretta v. Peach*, 195 Mich. App. 695, 697-98 (1992) (internal citations omitted).

Initially, the Court notes that the promissory note does not create an express principal-agent relationship between Rib Roof and Gerrits. The promissory note created an arrangement where Rib Roof would loan Gerrits funds to start his own general contracting business, which in turn would refer subcontracting business to Rib Roof. The agreement did not intend to employ or control Gerrits, make him a sales agent for Rib Roof, nor permit him to enter into or terminate contracts on Rib Roof's behalf. In fact, Plaintiffs communicated their express disavowal of directly accepting Gerrits' referral business during January 2006, before the alleged fraud. In short, there is no genuine issue of material fact as to whether Gerrits was acting as a "business representative" for Plaintiffs as contemplated under *St. Clair Intermediate School District*.

However, even assuming that the promissory note created a limited express agency relationship, it is clear that not only did Gerrits act outside of the scope of that narrow authority, he acted purely for his own personal benefit. The general rule under Michigan law is that a principal is not liable for intentional or reckless torts committed outside the scope of the agency relationship. *Zsigo v. Hurley Med. Ctr.*, 475 Mich. 215, 221 (2006). A principal may be held liable under the doctrine of respondeat superior where the agent was promoting or furthering the principal's business in some way, or if the principal committed a tort while involved in a service of benefit to the principal. *Kester v. Mattis, Inc.,* 44 Mich. App 22, 24 (1972). "An employer is not liable for his employee's tortious act if the employee acts outside his employment to accomplish a purpose of his own." *Caron v. Walmart Stores, Inc.*, No. 254915, 2005 WL 1278480, *1 (Mich. Ct. App. May 31, 2005) (unpublished) (citing *Martin v. Jones,* 302 Mich. 355, 358 (1942)); *Potter v. Secrest, Wardle, Lynch, Hampton, Truex & Morley, P.C.*, No. 265002, 2007 WL 1345870, *2 (Mich. Ct. App. May 8, 2007) (unpublished) ("There can be no vicarious liability for the actions of a[n ] employee whose sole purpose is his own").

The promissory note provided Gerrits with $75,000 for a period of six months to launch his own general contracting business, which would refer subcontracts to Rib Roof. Gerrits then falsified a Rib Roof subcontractor agreement to obtain funds from Defendant to reimburse Rib Roof for Gerrits' personal debt and money owed from the previous Brighton contract. These fraudulent actions were solely for Gerrits' personal benefit, and were completely outside his alleged authority to find subcontractor business for Rib Roof. Assuming that Gerrits was acting according to express authority, he was not acting in furtherance of Plaintiffs' business by fraudulently obtaining Defendant's check – he was simply trying to solve his own personal

predicament by paying back the $75,000 and other funds that he owed Rib Roof from a previous project. *See Bryant v. Brannen*, 180 Mich. App. 87, 98 (1989).

The final question is whether Defendant can succeed on a theory that Plaintiffs "ratified" Gerrits' actions when they refused to refund the deposited check once they discovered Gerrits' scheme. "Unauthorized acts of an agent are ratified if the principal accepts the benefits of the unauthorized acts with knowledge of the material facts." *Bruno v. Zwirkoski*, 124 Mich. App. 664, 668 (1983). Ratification only occurs when the ratifier has full knowledge of the facts at the time of ratification. *See Moore v. Mitchell*, 278 Mich. 10, 20-21 (1936). Although Plaintiffs claim that they were unaware of Gerrits' fraudulent acts until Defendant's counsel's August 10, 2006 letter, Ferrell stated that he was "surprised" at the time of payment that Gerrits was able to obtain such a large amount of money. However, Defendant's ratification claim fails because, as discussed above, Gerrits was not acting as an "agent" pursuant to any express authority at the time of the fraud.

For the foregoing reasons, the Court rejects Defendant's argument that agency law provides a basis for Plaintiffs' liability.

## 2. Holder in Due Course

Plaintiffs contend that since they are a holder in due course of Defendant's check for the purposes of the UCC, they took the check free of all claims, including conversion and unjust enrichment. Plaintiffs urge the Court to follow the reasoning of the Western District of Michigan case *Grand Rapids Auto Sales, Inc. v. MBNA America Bank*, 227 F. Supp. 2d 721 (W.D. Mich. 2002).

Michigan law defines a holder in due course in the following manner:

A person taking an instrument, other than a person having rights of a holder in due course, is subject to a claim of a property or possessory right in the instrument

or its proceeds, including a claim to rescind a negotiation and to recover the instrument or its proceeds. A person having rights of a holder in due course takes free of the claim to the instrument.

Mich. Comp. Laws § 440.3306.

Michigan law places the following additional considerations in determining whether a party is a holder in due course:

(1)     Subject to subsection (3) and section 3106(4), "holder in due course" means the holder of an instrument if both of the following apply:

(a)     The instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity.

(b)     The holder took the instrument (*i*) for value, (*ii*) in good faith, (*iii*) without notice that the instrument is overdue or has been dishonored or that there is an incurred default with respect to payment of another instrument issued as part of the same series, (*iv*) without notice that the instrument contains an unauthorized signature or has been altered, (*v*) without notice of any claim to the instrument described in section 3306, and (*vi*) without notice that any party has a defense or claim in recoupment described in section 3305(1).

Mich. Comp. Laws § 440.3302. Article 3 further defines "good faith" as "honesty in fact and the observance of reasonable commercial standards of fair dealing." Mich. Comp. Laws § 440.3103(1)(d). Article 1 defines "notice":

Notice, knowledge, or a notice or notification received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction, and in any event from the time when it would have been brought to the individual's attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. Due diligence does not require an individual acting for the organization to communicate information unless such communication is part of his or her regular duties or unless he or she has reason to know of the transaction and that the transaction would be materially affected by the information.

Mich. Comp. Laws § 440.1201(27). Article 1 further states that "[a] person has 'notice' of a fact when he or she has actual knowledge of it; he or she has received notice or notification of it; or from all the facts and circumstances known to him or her at the time in question he or she has reason to know that it exists." Mich. Comp. Laws § 440.1201(25); *see Barbour v. Handlos Real Estate and Bldg. Corp.*, 152 Mich. App. 174, 185-85 (1986). If a party meets the requirements for a holder in due course, it "is under no duty to make an inquiry as to the validity of the underlying transaction[.]" *Mox v. Jordan*, 186 Mich. App. 42, 47 (1990).

There is no dispute that Defendant's check was a "negotiable instrument" for the purposes of Mich. Comp. Laws § 440.3104. According to these relevant statutes, the Court must determine whether there is a genuine issue of material fact on the following issues, whether: (1) the check presented any evidence of forgery, alteration, irregularity, or completeness that the instrument's authenticity would be questioned; (2) Plaintiffs took the check for value; (3) Plaintiffs took the check in good faith; (4) Plaintiffs had notice that the instrument was overdue or had been dishonored; (4) Plaintiff had notice that the instrument contained an unlawful signature; (5) Plaintiffs had notice of a claim under § 3306; and (6) whether Plaintiffs had notice of a defense or claim in recoupment as described § 3305(1).

In *Grand Rapids Auto Sales*, an employee of the plaintiff wrote checks drawn upon her own company to pay her husband's credit card bills owed to the defendant. 227 F. Supp. 2d at 723. The defendant accepted and processed checks through an automated system. *Id*. The defendant and the plaintiff did not otherwise have any business relationship. *Id*. Upon discovery of the employee's actions, the plaintiff sued the defendant for common law duty of inquiry and for conversion. *Id*. In finding that the defendant met all of the requirements of § 3302(1) as a holder in due course, the district court concluded:

[The defendant] meets all of these requirements with regard to the [plaintiff's] checks. First, there is no evidence that a forgery or alteration was apparent from the face of the checks. Second, [the defendant] took the checks "for value," even though [the plaintiff] did not receive the value. An instrument is transferred for value if it "is issued or transferred as payment of . . . . an antecedent claim against any person." Here, the checks were issued to [the defendant] as payment for the antecedent debt of Stewart's husband. Third, [the defendant] took the checks in "good faith." "Good faith" is defined as "honesty in fact in the conduct or transaction concerned." As discussed above, [the defendant] processes checks received for credit card payments electronically without manually examining them. Because the UCC recognizes automated processing as a commercially reasonable practice common in the banking industry, [the defendant] is entitled to rely solely on this method without examining each check. In addition, given the large volume of payments [the defendant] processes each day, it would be unreasonable to require [the defendant] to examine each check it receives. Furthermore, as mentioned above, even if [the defendant] actually reviewed each check as part of its regular procedure, [the defendant] would still act in good faith by accepting the [plaintiff] checks because there are a number of legitimate reasons why an employer may pay the credit card debt of its employee. Fourth, there is no evidence that [the defendant] took the [plaintiff's] checks with actual or constructive notice that they contained an unauthorized signature or that they were subject to a claim described in UCC § 3-306. [The plaintiff] attempts to defeat [the defendant's] holder in due course status through its claims that [the defendant] had a duty to inquire of [the plaintiff] regarding [the employee's] authority to negotiate the checks in payment of her husband's credit card debt and that [the defendant] had notice of a breach of fiduciary duty by [the employee]. [The plaintiff's] claim that [the defendant] had a duty to inquire must be rejected for the reasons set forth above. [The plaintiff's] claim that [the defendant] had notice of a breach of fiduciary duty by [the employee] also fails because there is no evidence that [the defendant] had knowledge that [the employee] was a fiduciary of [the plaintiff] or of a breach of fiduciary duty by [the employee].

*Id*. at 728-29 (internal citations and footnote omitted).[5]

---

[5]     The relevant reasoning in *Grand Rapids Auto Sales* has found explicit traction in several other courts confronted with similar facts. *See, e.g., DBI Architects, P.C. v. American Express Travel-Related Services Co., Inc.*, 388 F.3d 886, 895-96 (D.C. Cir. 2006) (holding that where a company's accounting manager wrote checks from the corporate account to cover her personal expenses charged to a corporate credit card, the credit card company was a holder in due course, where it used an automated check processing system and acted in good faith); *Travelers Casualty & Surety Co. v. Citibank (South Dakota), N.A.*, No. 03-2548, 2007 WL 2875460 (M.D. Fla. Sept. 28, 2007) (unpublished) (applying Florida law) (holding that where an employee embezzled corporate checks from her employer to pay her personal bills, the bank's holder in due course status free it from the plaintiff's claims).

Defendant contends there are genuine issues of material fact on the issue of whether Plaintiffs took the check in good faith and without notice of claims, including: (1) their knowledge that Defendant did not have any involvement with the Brighton project; (2) Plaintiffs should have suspected something suspicious and inquired into the facts that Gerrits was apparently able to secure a large amount of money, given his previous inability to pay; and (3) evidence that Plaintiffs knew that Gerrits had not yet been paid for the Redford project.

This case is factually distinguishable from *Grand Rapids Auto Sales* and its progeny. In *Grand Rapids Auto Sales*, the district court found that the defendant's automated check processing was commercially reasonable under the UCC and that even if the defendant reviewed the employee's check individually "there are a number of legitimate reasons why an employer may pay the credit card debt of its employee." 227 F. Supp. 2d at 729. In the instant case, Plaintiffs did not automatically process the checks, nor did they state any "legitimate reasons" why Defendant, an entity with which Plaintiffs had no business relationship, would be paying $137,000.00 to settle Gerrits' preexisting personal, and unrelated, business debt. Furthermore, the record demonstrates that Plaintiffs were aware of Gerrits' shoddy business practices, and their employee, Ferrell, expressed suspicion to Plaintiffs of the transaction at the time of its occurrence. *See New Properties, Inc. v. Newpower, Inc.*, No. 259932, 2006 WL 2632310, *7 (Mich. Ct. App. Sept. 14, 2006) (unpublished) ("Defendants assert that plaintiffs offered no proof concerning the single check and how examination of the face of the instrument would have provided notice. However, defendants fail to consider that this is a case replete with suspicious circumstances"). The check was not written from the accounts of Gerrits or his company CCL. It is undisputed that Plaintiffs did not make any efforts to contact Defendant or Gerrits to inquire into the basis for the check. The testimony further indicated that Plaintiffs at most cashed only

one check per day, so this was not an occasion with multiple checks being processed at the same time. (Mitchell Dep. 58; Ferrell Aff. ¶ 21). Also, the significant amount of this check was another warning sign.

Viewing the facts in the light most favorable to the non-moving party, the Court cannot determine as a matter of law whether Plaintiffs acted without notice and in good faith in accepting and depositing Defendant's check. Therefore, the Court denies summary judgment to Plaintiffs on a holder in due course theory.

> 3.      Statutory Conversion

Plaintiffs contend that even if they are not to be considered "holders in due course," Defendant has failed to demonstrate that Plaintiffs had "actual knowledge" that Gerrits had converted the check.

Statutory conversion under Michigan law includes the following elements:

(1)    A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:

     (a)    Another person's stealing or embezzling property or converting property to the other person's own use.

     (b)    Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

(2)    *The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.*

Mich. Comp. Laws § 600.2919a (emphasis added).

The Michigan Supreme Court has recently clarified that statutory conversion requires "actual," and not simply "constructive," knowledge:

A plain reading of this statute indicates that a person must know that the property was stolen, embezzled, or converted in order to be held liable. That the person "should have known" is not sufficient to impose liability under the statute.
. . . .
We hold that, under MCL 600.2919a, constructive knowledge is not sufficient; a defendant must know that the property was stolen, embezzled, or converted.
. . . .
[Section] 600.2919a, imposes no duty on the defendant to make an inquiry.

*Echelon Homes, LLC, v. Carter Lumber Co.*, 472 Mich. 192, 197, 199, 201 (2005).

Plaintiffs essentially contend that Defendant's summary judgment proofs amount to, at most, constructive knowledge. The Court agrees, and concludes that under the statute the record does not give rise to any reasonable inference that Plaintiffs were actually aware in fact that Gerrits had fraudulently obtained the check. Furthermore, Michigan's conversion statute places no obligation on Plaintiffs to inquire into the status of the check.

Therefore, the Court GRANTS summary judgment to Plaintiffs' on Defendant's statutory conversion counterclaim.

4.      Common Law Conversion

The Court concludes that the fact that genuine issues of material fact exist as to whether Plaintiffs acted as a "holder in due course" of the check also provides a basis for the Court to conclude that Plaintiffs are subject to Defendant's common law conversion counterclaim. Unlike statutory conversion, which requires "actual knowledge" that property was stolen, embezzled, or converted, common law conversion under Michigan law is defined by "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Murray Hill Publ'ns, Inc. v. ABC Commc'ns, Inc.*, 264 F.3d 622, 636-37 (6th Cir. 2001) (citation omitted). The UCC recognizes that the common law of conversion applies to negotiable instruments. *See* Mich. Comp. Laws § 440.3420(1); 22 Williston on Contracts 60:26 (4th ed.). "Generally, good faith is not a defense to conversion; it can be committed unwittingly."

*United States v. NBD Bank, N.A.*, 922 F. Supp. 1235, 1248 (E.D. Mich. 1996) (citing *Citizens Ins. Co. of America v. Delcamp Truck Ctr., Inc.*, 178 Mich. App. 570 (1989)).

The United States Supreme Court recognized, long ago, that a defendant who receives currency in payment in good faith for an existing debt cannot be compelled to make repayment when it is discovered subsequently that the money had been embezzled by the payor. *Rankin v. Chase Nat'l Bank*, 188 U.S. 557, 565-66 (1903); *Hinkle v. Cornwell Quality Tool Co.*, 532 N.E.2d 772, 777 (Ohio Ct. App. 1987) ("A holder in due course of a stolen negotiable instrument can receive good title thereto and is subject only to the defense that was a party to the theft. In sum, a bona fide purchaser of a bank note, or a holder in due course, cannot be held liable for conversion"); *TCF Mortgage Corp. v. Gelber Holding Co.*, No. 91-2125, 1991 WL 230843, *3 (N.D. Ill. Oct. 29, 1991) (unpublished) ("A defendant who receives money in good faith in the course of business cannot be liable for unjust enrichment to a plaintiff who claims that the money was wrongfully taken by someone else"). In other words, the UCC's holder in due course doctrine is commensurate with the common law principal that a bona fide purchaser cannot be liable for conversion.

Since there are disputed issues of material fact exist on whether Plaintiffs had notice and took the instrument in good faith, the Court likewise denies Plaintiffs' motion for summary judgment on Defendant's conversion counterclaim.

5.     Unjust Enrichment

Unjust enrichment consists of (1) the receipt of a benefit by the defendant from the plaintiff; and (2) an inequity resulting to the plaintiff because of defendant's retention of that benefit. *Sweet Air Investment, Inc v. Kenney,* 275 Mich. App. 492, 504 (2007); *see DaimlerChrysler Servs. North America v. Summit Nat'l, Inc.*, No. 07-1357, 2008 WL 3889747,

*7-8 (6th Cir. Aug. 20, 2008) (unpublished).  If unjust enrichment exists, the law will imply a contract in order to prevent the unjust result. *Kenney*, 275 Mich. App. at 504. A contract may be implied under this theory only if there is no express contract. *Martin v. East Lansing School Dist,* 193 Mich. App. 166, 177 (1992). "Even though no contract may exist between the two parties, under the equitable doctrine of unjust enrichment, '[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other.'" *Kammer Asphalt Paving Co. v. East China Twp. Schs.*, 443 Mich. 176, 185 (1993) (citation omitted).

As noted above, if Plaintiffs can show that they are entitled to holder in due course status, Defendant cannot maintain an unjust enrichment claim. *See, e.g., Wilson v. Toussie*, 260 F. Supp. 2d 530, 543-44 (E.D.N.Y. 2003); *TCF Mortgage*, 1991 WL 230843, *3.

However, if it is determined that Plaintiffs are not so entitled, Defendant can maintain an unjust enrichment claim on these facts. "Michigan law does not require a showing of knowledge or improper conduct to find that a party was unjustly enriched." *Franklin Bank, N.A. v. Zero Plus Advantage*, No. 212712, 2001 WL 682228, *3 (Mich. Ct. App. Apr. 20, 2001) (unpublished); *see Ticor Title Ins. Co. v. Nat'l Abstract Agency, Inc.*, No. 05-73709, 2007 WL 2710113, *8 (E.D. Mich. Sept. 13, 2007) (unpublished). "Generally, a plaintiff has a right to reimbursement if a person has possession of money 'which in equity and good conscience belongs to the [other party].'" *Franklin Bank*, 2001 WL 682228, *3 (quoting *Michigan Educ. Employees Mut. Ins. Co. v. Morris*, 460 Mich. 180, 198 (1999)). Thus, the Court finds that if Plaintiffs are unable to show at trial that they qualify as a holder in due course, Defendant's allegations state a cognizable and viable counterclaim for unjust enrichment.[6]

---

[6]    Defendant further argues that the Court should impose a "constructive trust" over the disputed funds. A constructive trust is typically imposed where it is necessary to do equity or to prevent unjust enrichment. *Kammer*, 443 Mich. at 188. As with the unjust enrichment analysis, Defendant can proceed on this theory at trial.

Accordingly, the Court denies summary judgment to Plaintiffs on Defendant's unjust enrichment counterclaim.

## III.     CONCLUSION

For the foregoing reasons, the Court hereby:

(1)     **DENIES** the parties' cross motions for summary judgment on Plaintiffs' declaratory judgment action;

(2)     **GRANTS** summary judgment to Plaintiffs on Defendant's statutory conversion counterclaim; and

(3)     **DENIES** summary judgment to Plaintiffs on Defendant's common law conversion and unjust enrichment counterclaims.

Defendants' common law conversion and unjust enrichment counterclaims will proceed to trial.

**SO ORDERED.**

            s/Paul D. Borman
            PAUL D. BORMAN
            UNITED STATES DISTRICT JUDGE

Dated:  August 29, 2008

CERTIFICATE OF SERVICE

Copies of this Order were served on the  attorneys of record by electronic means or U.S. Mail on August 29, 2008.

            s/Denise Goodine
            Case Manager