**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

RIB ROOF METAL SYSTEMS, INC., and
COMPONENTS PLUS, INC.,

        Plaintiffs/Counter-Defendants,

v.

NATIONAL STORAGE CENTERS OF
REDFORD, INC.,

        Defendant/ Counter-Plaintiff.

_____ /

Case Number: 07-13731

JUDGE PAUL D. BORMAN
UNITED STATES DISTRICT COURT

**OPINION AND ORDER GRANTING JUDGMENT TO PLAINTIFF, AND REJECTING
DEFENDANT'S COUNTERCLAIMS**

      Plaintiffs Rib Roof Metal Systems, Inc. and Components Plus, Inc. (collectively "Rib Roof") brought this action seeking a declaratory judgment that Rib Roof was a holder in due course of a check it negotiated from Defendant National Storage Centers of Redford, Inc. ("NSC"). Having conducted a bench trial, the Court makes the following finds of fact, conclusions of law, and enters declaratory judgment for Rib Roof.

**I. BACKGROUND**

      This diversity case arises from Rib Roof's negotiation of a $137,975.00 check made out to Rib Roof and drawn on NSC's account. Rib Roof seeks a declaratory judgment that it is legally entitled to keep the $137,975.00. NSC alleges in its counter-complaint that Gary Gerrits, a non-party to the instant litigation, fraudulently induced it to draw the check to Plaintiffs, that Rib Roof knew, or should have known, that the check was fraudulently obtained, and, therefore, seeks the

1

return of the $137,975.00.

## II. FINDINGS OF FACT

Plaintiff Rib Roof Metal Systems, Inc. is a Tennessee corporation, with its principal place of business in Tennessee. (Compl. ¶ 1). Plaintiff Components Plus, Inc. is a corporation registered in Texas, with its principal place of business in Texas. (*Id*. at ¶ 2). Defendant National Storage Center of Redford, Inc. is a Michigan limited partnership, with its principal place of business in Michigan. (*Id*. at ¶ 3). Rib Roof is in the business of designing, manufacturing, and installing metal roofing and building systems. NSC is the owner of a mini-storage facility in Redford, Michigan.

In late 2004/early 2005, non-party Gary Gerrits, a contractor, approached Rib Roof for a loan to start a general contracting business specializing in the construction of storage facilities. Rib Roof agreed to provide working capital to Gerrits as a way to expand its own business in Michigan. On January 7, 2005, Gerrits and Rib Roof entered into an "Agreement for Working Capital." (Trial Ex. 1, Agreement for Working Capital). Rib Roof agreed to loan Gerrits $75,000, for use as "working capital for the purpose of obtaining contracts for the installation of Rib Roof metal building products over the next 6 months." (*Id.* at ¶ 3). The promissory note Gerrits signed obligated him to re-pay Rib Roof within six months. (*Id.*, Promissory Note). When Rib Roof loaned Gerrits the money, it understood that Gerrits had three building contracts in the works, including a mini-storage facility to be built in Brighton, Michigan, and Rib Roof was under the impression that Gerrits would repay the loan with profits from the three building contracts. Gerrits did not specify the other two potential building contract locations. Thus, Rib Roof could assume that when the check at issue came to Plaintiff Rib Roof from a Redford location, that this was one of Gerrits' building locations.

Shortly after Rib Roof loaned Gerrits the money, Gerrits began work on the storage facility

project in Brighton ("Brighton Project"). On February 17, 2005, Gerrits subcontracted $178,300.00 worth of work on the Brighton Project to Rib Roof. (Trial Ex. 4, Subcontractor Agreement). Rib Roof completed its work on the Brighton Project by July 21, 2005. (Trial Ex. 7, Rib Roof, Inc. Invoice 4524). At that time, Rib Roof had not received any money from Gerrits. On September 9, 2005, Gerrits tendered Rib Roof a check for $29,325.00, the amount of the deposit for the subcontract, which was already completed. (Trial Ex. 9, Commerce Companies, LLC check). Two weeks later, on September 16, 2005, Rib Roof sent Gerrits a notice of furnishing to preserve its lien rights in the event that Gerrits did not pay Rib Roof for the materials provided under the subcontract. (Trial Ex. 10, Notice of Furnishing).

Rib Roof employees, including Lolly Peirson, Randy Ferrell, and Verne Moser, and the President of Rib Roof, Carl Mitchell, all made numerous collection calls to Gerrits in an attempt to collect the money owing on the Brighton Project. Their collection attempts were unsuccessful. As a result of Gerrits non-payment, Mitchell decided not to do business with Gerrits any more.

Also during this time, one of Rib Roof's largest clients, OB Construction, told Rib Roof that it would no longer do business with Rib Roof if it continued to do business with Gerrits. OB Construction told Ferrell that Gerrits was in financial trouble.

On December 2, 2005, Gerrits sent a letter to his subcontractors and suppliers on the Brighton Project, including Rib Roof, notifying them that he had not been paid by the owners of the Brighton Project and, therefore, could not pay the subcontractors and suppliers. (Trial Ex. 13, Ltr. from Commerce Companies, LLC to All Subcontractors and Suppliers). Gerrits wrote that he had secured a promissory note from the owners and was in the process of obtaining a loan from his bank. (*Id.*) Gerrits went on to write that he expected to issue the final payments on the job in February

3

2006. (*Id.*)

In January 2006, Gerrits obtained a contract to build a storage facility in Redford for Defendant NSC. (Trial Ex. 16, Agreement for Construction Services). Under the guise of procuring materials for the Redford project, Gerrits submitted a sworn statement for payment to NSC, and directed NSC to write a check to Rib Roof in the amount of $137,975.00, the amount Gerrits owed Rib Roof for both the personal loan and the Brighton Project. (Trial Ex. 18, Michigan Sworn Statement; Trial Ex. 19, Ltr. from Commerce Companies LLC). Before NSC issued Rib Roof a check, NSC asked Gerrits to produce the subcontractor agreement. Gerrits gave NSC a subcontractor agreement that was signed only by Gerrits; Rib Roof was not a signatory to the contract. (Trial Ex. 17, Subcontractor Agreement). Nevertheless, after seeing the subcontractor agreement, NSC issued a check payable to Rib Roof on February 8, 2008, in the full amount, and gave it to Gerrits. (Trial Ex. 20, Check). Unbeknownst to NSC, Gerrits had fraudulently fabricated the subcontractor agreement, and Rib Roof had never agreed to be a subcontractor on the Redford project.

After he obtained the check from NSC, Gerrits called Vern Moser, Rib Roof's chief financial officer, who worked out of Rib Roof's Nevada office, and told Moser that he was sending a check to pay off his loan and the amount owing on the Brighton project. Moser did not ask Gerrits where he got the money, and Gerrits did not mention that the check was issued by NSC. In an email from Gerrits to Moser, Gerrits reiterated that he was sending the check and asked where he should send it. (Trial Ex. 21, Email from Moser to Gerrits). Moser directed Gerrits to send the check to Lolly Pierson, Rib Roof's office manager in Rossville, Tennessee.

Pierson did not testify in person at trial; her *de bene esse* deposition was submitted and read

in Court. Her testimony included the following facts: Gerrits called Pierson to verify her address, and told her that he was sending a check and a transmittal letter to pay off the Brighton Project and the loan. (Pierson Dep. 45). Pierson was surprised when she received the check because Gerrits did not send the check in response to a specific collection call; there had been many previous collection calls. (Pierson Dep. 46). Pierson received and processed the check from NSC. (Pierson Dep. 42, 49). The transmittal letter that accompanied the check instructed Pierson to apply the check as follows:

| | |
|---|---|
| Brighton, MI job balance on contract: | $62,975.00 (full and final payment) |
| Repayment of 1/15/05 loan: | $25,000 |
| Repayment of 2/16/05 loan: | $25,000 |
| Repayment of 3/15/05 loan: | $25,000 |
| TOTAL: | $137,975.00 |

(Trial Ex. 22, Letter of Transmittal). Without the transmittal letter, Pierson would not have known which account to apply the check, as neither Gerrits nor his company were referenced on the check and Rib Roof did not have any direct business with NSC. (Pierson Dep. 55). Pierson did not question the validity of the third-party check because Rib Roof had received third-party checks "from time to time." (Pierson Dep. 52). Pierson did not contact NSC to inquire about the check. Pierson did not show the check to anyone at Rib Roof before she cashed it because she did not think it was necessary. (Pierson Dep. 50). Pierson did not have any reason to believe that Gerrits was dishonest, untrustworthy, or was engaged in illegal activity. (Pierson Dep. 67). Moser also testified that he had no reason to believe that Gerrits defrauded NSC into issuing the check at the time Rib Roof received it. (Moser Dep. 79-80).[1]

---

[1] Randy Ferrell, a former Rib Roof employee, testified that he would have questioned the check. However, Ferrell was not involved in the payment process. Ferrell did not receive the check, he did not endorse the check, and he did not deposit the check. The payment process was

In late July 2006, Paramount Construction, LLC, subcontractor on Defendant NSC's Redford Project, called to tell NSC that Paramount was owed money for the Redford Project. NSC then looked at all the payments it made to subcontractors and discovered that Gerrits fraudulently induced NSC to issue a check to Rib Roof. On August 10, 2006, NSC's attorney notified Rib Roof of Gerrits' actions and demanded the return of the $137,975.00. (Trial Ex. 37, Ltr. from Robert Gross to Carl Mitchell).

On August 25, 2006, Plaintiffs filed a Complaint for a declaratory judgment in the United States District Court for the Western District of Tennessee. On October 16, 2006, NSC filed a motion to dismiss for lack of personal jurisdiction. On August 28, 2007, the district court granted the motion and transferred the case to the Eastern District of Michigan. *See Rib Roof Metal Sys., Inc. v. Nat'l Storage Ctrs of Redford*, No. 06-02553 (W.D. Tenn. Aug. 28, 2007).

On August 29, 2008, the instant Court ruled on the parties' cross-motions for summary judgment. The Court conducted a bench trial on the remaining issues beginning on March 3, 2009, and concluding on March 5, 2009. Counsel for Defendant National Storage stated in closing argument that, "this case boils down to Rib Roof's defense that it's a holder in due course of NMS' check." Counsel further stated that because Rib Roof had not met its burden of proof that it is a holder in due course, "NMS must prevail on its counterclaims . . . for unjust enrichment, conversion and/or constructive trust."

Based on the facts adduced at trial, as recited above, the Court has made conclusions of law, are set out below, which conclude that Plaintiff Rib Roof has proven by a preponderance of the

---

handled entirely by Lolly Pierson. Ferrell did not even see the check until months later, when he was contacted by NSC regarding the check.

evidence that it is a holder in due course. Thus, Defendant's counterclaims for unjust enrichment, conversion and constructive trust fail.

### III. CONCLUSIONS OF LAW

The threshold issue in this case is whether Rib Roof is a holder in due course. The parties agree that if this Court concludes that Rib Roof was a holder in due course when it deposited the check, Rib Roof takes the check free of NSC's claims for conversion and unjust enrichment. For the reasons that follow, the Court holds that Rib Roof was a holder in due course.

Generally, a person who accepts a negotiable instrument takes the instrument subject to the property or possessory rights of another, unless the person is a holder in due course. Mich. Comp. Laws § 440.3306. Under Michigan law, someone is a "holder in due course" if:

> (a) The instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity.
>
> (b) The holder took the instrument (I) for value, (ii) in good faith, (iii) without notice that the instrument is overdue or has been dishonored or that there is an incurred default with respect to payment of another instrument issued as part of the same series, (iv) without notice that the instrument contains an unauthorized signature or has been altered, (v) without notice of any claim to the instrument described in section 3306, and (vi) without notice that any party has a defense or claim in recoupment described in section 3305(1).

Mich. Comp. Laws § 440.3306.

It is undisputed that Defendant NSC's check was a negotiable instrument, and Plaintiffs took NSC's check for value. Further, NSC does not argue that the instrument contained evidence of forgery, alteration, irregularity or incompleteness, or was overdue, had been dishonored or contained an unlawful signature. Therefore, Court must determine whether: 1) Rib Roof took the check in good faith; 2) Rib Roof had notice of a claim under § 3306, i.e. a property or possessory claim by

7

a third party; and 3) whether Rib Roof had notice of a defense or claim in recoupment, such as fraud, as described § 3305(1).

"Good faith" is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." Mich. Comp. Laws § 440.3103(1)(d). There is no evidence that Rib Roof took the check dishonestly; Rib Roof did not know when it accepted the check from Gerrits that he had obtained it through improper means. Moreover, Rib Roof observed reasonable commercial standards of fair dealing. Rib Roof accepted a check, from a client, Gerrits, which appeared to have been legitimately issued to Rib Roof by NSC, a fellow company in the mini-storage industry, on behalf of Gerrits, for amounts owing on Gerrits' account. Gerrits informed Rib Roof that the check was in the mail, provided instructions for the application of the funds, and the check was for the exact amount that Gerrits owed. The fact the check was from a third-party payor and the fact that Gerrits paid the promissory note in full, are not enough to arise suspicion because Rib Roof received third-party checks from time to time and the promissory note was due in full when Gerrits presented the check to Rib Roof. Most importantly, the face of the check does not belie the fraud. Further, Gerrits, in securing the loans from Rib Roof had stated that he planned to repay the proceeds from other projects, without specifying the names of all of the projects. Thus, the fact that the check came from "another project," the Redford storage facility project, is not at all suspicious.

Rib Roof endorsed and deposited the check. Rib Roof's actions were perfectly reasonable, given what it knew at the time it cashed the check, and Rib Roof comported with reasonable standards of fair dealing. There was nothing amiss with the check, therefore, Rib Roof took the check in good faith.

The next issue is whether Rib Roof took the check without notice of NSC's claims or

Gerrits' fraud. Mich. Comp. Laws § 440.1201(27) defines "notice" as follows:

> Notice, knowledge, or a notice or notification received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction, and in any event from the time when it would have been brought to the individual's attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. Due diligence does not require an individual acting for the organization to communicate information unless such communication is part of his or her regular duties or unless he or she has reason to know of the transaction and that the transaction would be materially affected by the information.

Also, "[a] person has 'notice' of a fact when he or she has actual knowledge of it; he or she has received notice or notification of it; or from all the facts and circumstances known to him or her at the time in question he or she has reason to know that it exists." Mich. Comp. Laws § 440.1201(25); *see Barbour v. Handlos Real Estate and Bldg. Corp.*, 152 Mich. App. 174, 185-85 (1986).

There is no evidence that Rib Roof knew of NSC's claims or Gerrits' fraud when it took the check. Mich. Comp. Laws § 440.1201(27) provides that the person conducting the transaction must have had notice, or would have had notice if due diligence was exercised, at the time the transaction was completed. Here, Pierson negotiated the check. Notably, there is no indicia of the fraud on the check. In addition, Pierson did not have actual knowledge of Gerrits' fraud at the time she completed the transaction; no one at Rib Roof knew of Gerrits' fraud when the transaction occurred. Pierson also did not know that OB Construction told Rib Roof that Gerrits had financial problems, and there was no reason for Mitchell, Moser or Ferrell to pass along that information to Pierson. Rumors of financial troubles would not presumptively cast suspicion on any payment Gerrits tendered to Rib Roof, particularly when Gerrits represented to Rib Roof that he was seeking financing to pay his suppliers and subcontractors and Gerrits paid Rib Roof in February 2006, when

9

he expected to receive financing. Moreover, due diligence did not require Pierson to tell any one at Rib Roof about the third-party check because such communication was not a part of her regular duties and the check was not suspicious on its face.

NSC argued at trial that the presence of a third-party payor should have alerted Rib Roof that there was something wrong with the check, and Rib Roof should have investigated the source of Gerrits' funds by calling NSC. In essence, NSC contends that Rib Roof had a duty to inquire.

NSC's argument fails for two reasons. First, Pierson testified that Rib Roof receives third-party checks on occasion; that alone, therefore, is not enough to alert her suspicion and spur an inquiry. Second, a holder in due course is not required to question the funds behind the negotiable instrument, if the instrument is valid on its face. *See Mox v. Jordan,* 186 Mich. App 42, 47 (1990)*; Thomas v. State Mortgage, Inc,* 176 Mich. App 157, 165 (1989)*.* To hold otherwise would require holders to question all payments, even when there is no *indicia* of fraud, forgery, alteration, irregularity or incompleteness on the face of the check and the holder had no notice of suspicious circumstances. The Court's analysis then, necessarily, focuses on the condition of the check, and the knowledge Rib Roof had when it negotiated the check. Here, there was no *indicia* of fraud on the face of the check. Furthermore, Rib Roof did not know, and could not have known, that Gerrits had fraudulently obtained the check from NSC. Rib Roof, per Gerrits' letter to his suppliers and subcontractors, knew that Gerrits was seeking a loan and expected payment in February 2006; the check arrived in February 2006. Also, it is not suspicious that the Gerrits paid the loan in full; the promissory note was due in full. Gerrits failure to pay earlier, and the rumors of his money troubles relayed by OB Construction, also do not give rise to sufficient suspicion to warrant an investigation by Rib Roof. Accordingly, this Court holds that Rib Roof took the check without notice of the fraud

and NSC's claims.

## IV. CONCLUSION

For the reasons discussed above, this Court concludes that Rib Roof was a holder in due course, and that Defendant has not proven their counterclaims of common law conversion and unjust enrichment. In order to prevail on their counterclaims, this Court would have had to first find that Rib Roof was not a holder in due course. As this Court concluded that Rib Roof was a holder in due course, Defendant's counterclaims necessarily fail.

Accordingly, the Court enters judgment on behalf of Rib Roof, declares that Rib Roof is legally entitled to retain the $137,975.00, and dismisses NSC's counter-complaint with prejudice.

SO ORDERED.

       S/Paul D. Borman
       PAUL D. BORMAN
       UNITED STATES DISTRICT JUDGE

Dated: April 8, 2009

### CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on April 8, 2009.

       S/Denise Goodine
       Case Manager